## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

DRS. MINOLI PERERA & MELISSA SIMON    )
)
   Plaintiffs,    )
)
     v.    )    Case No. 8:26-cv-2389
)
NATIONAL INSTITUTE OF HEALTH;    )
9000 Rockville Pike    )
Bethesda, MD 20892 (Montgomery County),    )
)
JAY BHATTACHARYA, *in his official capacity*    )
*as Director of the National Institute of Health*;    )
9000 Rockville Pike    )
Bethesda, MD 20892 (Montgomery County),    )
)
UNITED STATES DEPARTHMENT OF    )
HEALTH AND HUMAN SERVICES,    )
200 Independence Ave. SW,    )
Washinton, D.C. 20201,    )
)
ROBERT F. KENNEDY, *in his official capacity*    )
*as Director of United States Department of Health*    )
*and Human Services*;    )
200 Independence Ave. SW,    )
Washinton, D.C. 20201,    )
)
   Defendants.    )

## COMPLAINT

1.    Plaintiffs, Drs. Minoli Perera and Melissa Simon, bring this declaratory and injunctive relief action under the First and Fifth Amendments of the United States Constitution, and the Affordable Care Act, 42 U.S.C. § 18116(a), stemming from Defendants' terminating federal grant awards issued by the National Institute of Health based on unlawful animus toward certain ideological viewpoints and protected groups.

1

## PARTIES

2.      Plaintiff Dr. Minoli Perera is an Associate Professor within the Department of Pharmacology and Center for Pharmacogenomics at the University of Northwestern's Feinberg School of Medicine. Dr. Perera has expertise in pharmacokinetics, clinical pharmacology, and human genetics. Plaintiff Perera's laboratory at Northwestern University focuses on pharmacogenomics (using a patient's genome to predict drug response). She has received awards as the Genomics and Health Disparities Lecturer, and the Leon I. Goldberg Early Investigator Award from the American Society of Clinical Pharmacology and Therapeutics. She is the current President of the Pharmacogenomics Global Research Network, and she is an editorial board member of the Pharmacogenomics Journal and Frontiers in Pharmacogenomics.

3.      Plaintiff Dr. Melissa Simon, MPH, MBA, is a Professor of Obstetrics and Gynecology, Preventive Medicine, and Medical Social Sciences at the University of Northwestern's Feinberg School of Medicine. She serves as the Vice Chair for Research in the Department of Obstetrics and Gynecology, and she is the George H. Gardner, M.D., Professor of Clinical Gynecology. Dr. Simon's research is principally aimed at promoting health equity and care for medically underserved populations. She is a nationally recognized leader in healthcare prevention, serving on the U.S. Preventative Task Force and as a former member of the NIH Advisory Council on Women's Health Research. She is an elected member of the National Academy of Medicine where she serves on the Roundtable on the Promotion of Health Equity. She is additionally nationally recognized as a mentor to postdoctoral and clinical fellows. In 2018, the White House and National Science Foundation awarded her with the Excellence in Mentor in Science Award, the highest such STEM mentorship award one can receive in the United States. She is a Presidential Leadership Scholar supported by former Presidents Clinton, George H.W.

Bush, George W. Bush, and the Lyndon Johnson Presidential Foundation. Prior to the NIH terminating in April 2025 the grant that is the subject of this action, Dr. Simon was the number one NIH-funded OBGYN researcher in the United States and was one of, if not the highest, NIH-funded researcher in 2024 at Northwestern University. In 2026, the American Medical Women's Association granted her its Woman in Science Award for her "exceptional contributions to medical science, especially in women's health … and leadership in her field."[1] Together with her considerable contributions to research into promoting health equity, she remains a clinical expert in obstetrics and gynecology, routinely providing care to publicly insured and uninsured women at Northwestern's Prentice Women's Hospital.

4.    Defendant National Institutes of Health ("NIH") is an agency of the United States within the Department of Health and Human Services. It is the primary federal agency responsible for conducting and supporting biomedical and health research in the United States. It is comprised of twenty-seven discrete Institutes and Centers ("ICs") that study specific diseases or body systems.

5.    Defendant Dr. Jay Bhattacharya is the NIH Director. He is sued in his official capacity. As NIH Director, he is responsible for setting policy for NIH and for planning, managing, and coordinating the programs and activities of all NIH components.

6.    Defendant U.S. Department of Health and Human Services ("HHS") is an executive department of the United States Government. It houses and oversees NIH. HHS is responsible for the administration of federal health programs, including via research funding.

---

[1] *See* https://www.issuewire.com/dr-melissa-simon-to-receive-the-2026-amwa-woman-in-science-award-1854977274677052 (last visited June 15, 2026).

3

7.      Defendant Robert Kennedy, Jr., is the HHS Secretary. He is sued in his official capacity. As HHS Secretary, he is responsible for all aspects of the operation and management of HHS, including implementing HHS's duties under federal law.

### JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the United States Constitution and a federal statute.

9.      This Court has authority to issue the requested relief pursuant to 28 U.S.C. § 2201, Federal Rules of Civil Procedure 57 and 65, and its equitable powers.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers and agencies of the United States served in their official capacities and at least one Defendant resides in this District.

### ALLEGATIONS

### *NIH Grantmaking Process*

11.     NIH's grant application and review process is competitive and standardized. NIH implements priorities, invites researchers to submit proposals to advance those priorities, and scrutinizes proposals to determine the projects that will receive NIH funds. The success rate for grant applicants in 2025, for example, was only twelve percent.[2]

12.     NIH's grant-making process, therefore, ensures that only the most promising research proposals are funded. In doing so, NIH follows a well-established procedure governed by the Public Health Services Act, the NIH Grants Policy Statement, the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for HHS Awards (45 C.F.R. Part 75), and other regulations.

---

[2] *See* https://report.nih.gov/nihdatabook/category/10 (last visited May 22, 2026).

13. "Congress requires the NIH operate predictably and with stability, not just for its understanding of how the NIH is fulfilling its duties to the American people, but also to provide a predictable path for researchers." *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 791 F. Supp. 3d 119, 129 (D. Mass. 2025) (alteration from original). Toward that end, "Congress … requires the NIH to provide a "'National Institutes of Health Strategic Plan'" every six years … "to provide direction to the NIH's biomedical research investments." *Id.* (alteration from original).

14. The Strategic Plan is required, for example, to "identify … priorities and objectives in biomedical research" such as assessment of the "state of biomedical and behavioral research" and opportunities therein, "priorities and objectives to advance the treatment, cure and prevention of health conditions," "emerging scientific opportunities," "health challenges," and "scientific knowledge gaps." *Id.* (citing 42 U.S.C. § 282(m)(2)(A)) (internal quotations omitted).

15. Within this framework, Congress has additionally directed the NIH to "utilize diverse study populations, with special consideration to biological, social, and other determinants of health that contribute to health disparities." *Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Institutes of Health*, 795 F. Supp. 3d 678, 686 (D. Md. 2025) (citing 42 U.S.C. § 282(b)(8)(D)(ii)) (internal quotations omitted). Relatedly, some ICs within the NIH are dedicated to studying "minority populations," *Am. Pub. Health Ass'n*, 791 F. Supp. 3d at 129, such as the National Institute of Minority Health and Health Disparities.[3]

16. Congress has also mandated the NIH to promote workforce diversity for the upcoming generations of researchers, creating the Next Generation of Researchers Initiative under which it directed the NIH to focus on "providing opportunities for new researchers," including

---

[3] *See* https://www.nimhd.nih.gov/ (last visited May 28, 2026).

through "enhance[d] workforce diversity" and "increase[d] opportunities for new researchers to receive funding." 42 U.S.C. § 283o(b). As reflected in the NIH's related policy statement:

> The current hypercompetitive environment is challenging for early-stage investigators and early established investigators. Many highly meritorious applications go unfunded. While scientific workforce diversity supports the NIH mission, expanding the pool of investigators from nationally underrepresented backgrounds in the biomedical research workforce remains an elusive goal.[4]

17.    **Researchers' Applications.** In accordance with research priorities in their Strategic Plans, the NIH solicits applications for grants through notices of funding opportunities ("NOFOs")—public announcements that outline the conditions for applying for grant funding. Resulting applications discuss the proposal's objectives and methodology and the significance of the research to be performed. The applications must conform to 45 C.F.R. Part 75, which prescribes requirements regarding budget and facilities, and—according to NIH policy—must include a discussion of how the research will be inclusive of gender and minority groups. Given the importance of federal funding to academics, researchers, and their associated organizations together with the low approval percentage, the preparation of grant applications requires considerable effort; the applications are often hundreds of pages long, scrupulously researched, and require detailed research planning, budgeting, and funding justification.

### *NIH Termination Process*

18.    Until 2025, grant terminations were exceedingly rare, with an average of only twenty terminations annually during the past decade, as reported by members of the House and Senate Appropriations Committees.[5] This equates to an approximate 0.03% cancellation rate based on the number of NIH grant awards during recent fiscal years.

---

[4] *See* https://grants.nih.gov/grants/guide/notice-files/NOT-OD-17-101.html (last visited June 15, 2026).

[5] *See* https://democrats-appropriations.house.gov/news/press-releases/delauro-murray-baldwin-blast-director-bhattacharya-terminating-thousands-active (last visited June 15, 2026).

19. Terminations are governed by HHS regulations, which permit terminations on the following grounds: (i) non-compliance with an award's terms/conditions, (ii) if mutually agreed between the researcher and NIH staff, or (iii) "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340.

20. Additionally, NIH must follow a formal process to terminate a grant. *See* 2 C.F.R. Parts 200.340 through 200.343. It must provide written notice to the recipient stating the reasons for termination and the effective date. 45 C.F.R. § 75.373; 2 C.F.R. § 200.340(a)(3). Recipients then can object and provide information challenging the termination decision. 2 C.F.R. § 200.342.

### *The Executive Orders and Resulting Agency Directives*

21. On January 20, 2025, President Trump issued Executive Order 14151 ("EO 14151"), which, among other things, directed agencies to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." Exec. Ord. 14151 at § 2(a).

22. On January 21, 2025, President Trump issued Executive Order 14173 ("EO 14173"), which, among other things, requires that the Director of the Office of Management and Budget to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and "[t]erminate all diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." EO 14173 at § 3(c)(ii)-(iii. ).

23.     On or about February 28, 2025, the NIH Director issued a "Staff Guidance – Award Assessments for Alignment with Agency Priorities – March 2025" (the "February 2025 Guidance"), which stated that the NIH would "no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI)" and that NIH personnel must "completely excise all DEI activities" from grant awards. Pursuant to the February 2025 Guidance, NIH grant awards must not be issued if the sole purpose of the project is DEI-related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity). For grants which only "partially support[] DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope)," the NIH requires that such grants be reworked to remove DEI-related content or be terminated. For projects that do "not support DEI activities, but may contain language related to DEI," the award may only "[o]nce the language is removed."

24.     On March 25, 2025, the NIH issued the NIH Grants Management Staff Guidance – Award Assessments or Alignment with Agency Priorities – March 2025, which states that the NIH would "no longer prioritize research and research training programs that focus on [DEI]. The NIH directed officials to, among other things, tell grantees whose awards were being terminated that "it is the policy of NIH not to prioritize [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern[.]]"

25.     This Complaint refers to all this internal HHS and NIH guidance in February and March 2025 as the "**Agency Directives**."

26.     "Diversity," "equity," "equity objectives," "inclusion," "DEI," "Black," "Indigenous," "Latinx," "Native", "disability," "women," "sexual or gender minority," "under-

represented groups" "Puerto Rican," "African," "Hispanic" and their variants are referred to as the "**Banned Topics**." The termination of grants and/or related funding, and any refusal to reconsider the terminations are collectively referred to as the "**Challenged Agency Actions**."

*Plaintiff Perea's Study and Grant Award*

27.     In or around November 2022, Plaintiff Perera principally authored a research funding request to the NIH's National Human Genome Research Institute.

28.     The project sought federal funding to study Clopidogrel, a widely prescribed anti-platelet[6] drug used to treat coronary heart disease with known genetic variants that affect an individual's response to the drug.

29.     No previous study, Plaintiff's grant application explained, had evaluated comprehensively the contributions of other multi-omic[7] datatypes on the drug's response in non-European populations.

30.     Accordingly, the proposed project sought federal funding to study the transcriptomic, epigenomic, proteomic, and/or metabolomic associations to Clopidogrel response or resistance in a cohort comprised of individuals of Puerto Rican descent. Such individuals' genetic profiles are valuable data sources in studies of this kind because they simply help assess the drug's risk/utility for populations with mixed ancestry—in this instance, European, African, and Native. State differently, the study would have evaluated data from a genetic admixture—specifically, the result of recent interbreeding between previously separated populations, which in

---

[6] Such medications reduce the ability of blood platelets to stick together, preventing the formation of clots in arteries.

[7] Biographical analysis that incorporates multiple omes, for example, genomic, epigenomic, and transcriptomic.

Puerto Ricans, beneficially includes Native and African DNA segments into the background of the European genome.

31.    In fact, Puerto Ricans' genetic ancestry represents all three major U.S. populations. Accordingly, the study's results would have yielded important data points in all U.S. populations.

32.    In September 2024, the NIH granted a multi-year, multi-million dollar research grant, Award No. 1R01HG013773-01, in connection with the following project title: Social, Genomic, and Epigenomic Drivers of Clopidogrel Response in Puerto Ricans.

33.    The NIH's Notice of Award identified Plaintiff Perera as the Project Director or Principal Investigator for the Project.

34.    The Notice of Award provided the following funding schedule to achieve the project's objectives: commitment of $745,930 in Year 1, with a budget period beginning in September 2024 and ending June 2025; the NIH committed to future funding at a Total Cost of $769,941 in Year 2; $763,341 in Year 3 and, $762,611 in Year 4—cumulatively, a $3,041,823 total award.

### The NIH Terminates Plaintiff Perera's Grant

35.    On or about April 15, 2025, the NIH terminated the award, asserting that "[r]esearch programs that are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness."

36.    The NIH additionally stated in the termination notice that "[i]t is the policy of NIH not to prioritize research programs related to DEI."

37.    . Section 8.5.2 of the NIH Grants Policy Statement states that "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take

10

appropriate corrective action before NIH makes a termination decision." However, in this instance, NIH instead decided to terminate the award immediately, without engaging with Plaintiff to evaluate whether modifying the project could cure NIH's concerns.

38.    Local ancestry of the kind the project aimed to evaluate is an important consideration in understanding genomic associations to clopidogrel response, gene expression, and predictive modeling in admixed populations.

39.    Nevertheless, the NIH asserted, without explanation, that "no modification of the project could align the project with agency priorities."

### *Plaintiff Simon's Project and Grant Award*

40.    In or around 2021, Plaintiff Simon principally authored a grant application to the NIH that sought funding for a project named Northwestern University Recruitment Transform Under-Representation and Achieve Equity (acronym, "Nurture").

41.    One aim of the project was to correct imbalances with under-represented groups ("URGs") that comprised only ten percent of tenured track faculty at Northwestern University. The project sought funding to hire fifteen individuals from URGs in Northwestern University's Feinberg School of Medicine, the Weinberg College of Arts and Sciences, and the McCormick School of Engineering and Applied Sciences.

42.    The projected defined URGs as individuals with a disability/disabilities; individuals from rural areas; Black, Indigenous, Latinx individuals; women in under-represented fields such as engineering; and individuals from a sexual or gender minority.

43.    The project's fifteen URG faculty member cohort was anticipated to be majority female (53%) with seven Black individuals, four Hispanic individuals, two Indigenous individuals,

11

and two White individuals whose expertise were in the areas of cancer; cardiovascular; or brain, mind, and behavior.

44. On of the principal aims of the project was to ensure the cohort members received sustained mentorship and assistance with obtaining R-level NIH grants (the largest category of funding) to fund research necessary for advancement and tenure.

45. In September 2022, the NIH granted a multi-year, $16 million award, No. U54CA272163, to fund the project over a five-year period.

46. The NIH's Notice of Award identified Plaintiff Simon as the Project Director or Principal Investigator for the Project.

### *The NIH Terminates Plaintiff Simon's Grant*

47. In April 2025, the NIH terminated the award, asserting "it no longer effectuates agency priorities" and that "[r]esearch programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness."

48. The NIH termination letter also stated that it was terminating the project on DEI grounds.

49. As to Plaintiff Simon applying corrective action to address the NIH's concerns, the termination letter stated that, according to the Department's Grants Policy Statement, "the NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision, no corrective action [wa]s possible here."

50. As a result of NIH terminating the award, Plaintiff Simon's project lost millions in federal funding.

### *Plaintiffs Resulting Harm from the Grant Terminations*

51. Having lost funding for their respective projects, Plaintiffs have experienced concrete harm.

52. For years, Plaintiff Perera's research has focused on the intersection of genetic ancestry and responses to medications.

53. For years, Plaintiff Simon's initiatives and research included, among other things, fostering career development of URGs and adding URG faculty members to university populations.

54. These research undertakings and initiatives were, unavoidably, hand-in-glove with Plaintiffs' respective standings as academics *and* their professional reputations. Consequently, the funding terminations have materially damaged their careers.

55. Given the NIH's haphazard process in terminating the funding for Plaintiff Perera's project, her lab, moreover, will be shuttered together with the loss of valuable work for, and from, two Ph.D. candidates, a lab manager, and data analyst who collectively support the lab.

56. Similarly, Northwestern University closed Plaintiff Simon's Center for Health Equity Transformation after the NIH terminated funding for her project, which she had been operating since 2018. Prior to its termination, the Center undertook efforts to improve the health for all individuals by exposing root causes of health inequities and served as a hub that pushed boundaries in research, education, workforce development, and community engagement.

57. Additionally, Plaintiffs have altered and/or censored their constitutionally-protected speech in seeking NIH funding for future studies in hopes of not offending the agency's

favored speech. In other words, attempting to analyze genomes using a cohort comprised of individuals from a certain national origin, and seeking to add as faculty members minority individuals have become dangerous ideas that now require Plaintiffs to draft amorphous funding applications or completely abandon efforts to seek such funding.

**COUNT I**
**Violation of First Amendment**
**Coercion; Retaliation; Content and Viewpoint Discrimination**
**(All Plaintiffs Against All Defendants)**

58.    Plaintiffs reallege paragraphs 1-57 above as if fully set forth herein.

59.    The First Amendment prohibits the government from "regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

60.    "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* at 828.

61.    "[E]ven in the provision of subsidies, the Government may not ai[m] at the suppression of dangerous ideas." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587. (1998) (internal quotation omitted).

62.    In the grant context, the government may not reject "a whole class of projects" based on "viewpoint alone," or use Federal funding to "impose a disproportionate burden calculated to "'drive certain ideas or viewpoints from the marketplace.'" *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, No. 25-cv-79-WES, 777 F.Supp.3d 87, 106-07 (D.R.I. Apr. 3, 2025) (quoting *Finley*, 524 U.S. at 587).

63.    Defendants' terminating grants to disadvantage or promote particular political and ideological viewpoints is "the product of invidious viewpoint discrimination." *Finley*, 524 U.S. at 587. With the explicit aim of eliminating certain ideas from the public sphere, Defendants terminated

14

the grants based on viewpoints (actual or presumed) reflected in Plaintiffs' research. The termination notices are clear that Defendants believe the content of Plaintiffs' speech conflicts with the government's views, and Defendants terminated the grants for this reason.

64.     The First Amendment also prohibits the government from using threats of legal sanction and other means of coercion to achieve the suppression of disfavored speech or academic freedom. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024).

65.     The First Amendment likewise bars the government from attempting to control academic thought or areas of research.

66.     Defendants' actions further violate the First Amendment by targeting for retaliation and elimination specific areas or topics of research, scholarship, and other forms of expression based on content and viewpoint, and by seeking to punish Plaintiffs for engaging in speech disfavored by the federal government.

67.     Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against Plaintiffs' core speech and academic freedom rights.

68.     As a direct and proximate result of Defendants' acts of discrimination, Plaintiffs have suffered economic harm; reputational and academic injury; loss of professional, research, academic, and/or advancement opportunities; and other damages.

**COUNT II**
**Violation of Equal Protection Component of the Fifth Amendment**
**(All Plaintiffs Against All Defendants)**

69.     Plaintiffs reallege paragraphs 1-57 above as if fully set forth herein.

70.     The Fifth Amendment prohibits the federal government from discriminating against individuals and/or groups based on race, color, national origin, sex, and gender identity.

71.     Defendants' terminating the grants was based on racial, color, national origin, sex, and/or gender identity animus.

15

72.    There is no compelling governmental interest that justifies the Defendants' disparate treatment of scientific research because the study involved individuals of Puerto Rican descent, Hispanic/Latino race, and/or one of the aims of such study was to improve the health of individuals with African and/or Indigenous genetic legacies.

73.    There is no compelling, legitimate, or important governmental interest that justifies the Defendants' disparate treatment of federal grant funding because such project involved hiring as faculty individuals who are Black, female, disabled, and/or a gender minority.

74.    Defendants terminated Plaintiffs' grants based upon a keyword search for DEI-related terms. *Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Institutes of Health*, 795 F. Supp. 3d 678, 698 (D. Md. 2025).

75.    Defendants undertook no review to determine if the grants "were actually unscientific." *Id.*

76.    Defendants cannot establish that the alleged unlawful conduct was narrowly tailored to serve a compelling government interest or was substantially related to a sufficiently important governmental interest.

77.    As a direct and proximate result of Defendants' acts of discrimination, Plaintiffs have suffered economic harm; reputational and academic injury; loss of professional, research, academic, and/or advancement opportunities; and other damages.

**COUNT III**
**Violation of Section 1557 of the Affordable Care Act**
**(Plaintiff Perera Against Defendants All Defendants)**

78.    Plaintiffs reallege paragraphs 1-57 above as if fully set forth herein.

79.    Section 1557 of the ACA, 42 U.S.C. § 18116(a), provides that "an individual shall not ... be denied the benefits of, or be subjected to discrimination under, any health program or

16

activity, any part of which is receiving Federal financial assistance, including credits [or] subsidies

... or under any program or activity that is administered by an Executive Agency," on the basis of

race, color, national origin, sex, age or disability (incorporating protections Title VI of the Civil

Rights Act of 1964 (42 U.S.C. § 2000d, *et seq.*), Title IX of the Education Amendments of 1972

(20 U.S.C. § 1681, *et seq.*), the Age Discrimination Act of 1975 (42 U.S.C. L 6101, *et seq.*), and

29 U.S.C § 794).

80.     Defendants are covered entities under Section 1557 and engaging in health or clinical

research is a health program or activity under Section 1557.

81.     By terminating federal funding for Plaintiff Perera's study, Defendants terminated

a grant and/or related funding for health and clinical research based on race, color, and/or national

origin.

82.     As a direct and proximate result of Defendants' acts of discrimination, Plaintiff

Perera has suffered economic harm; reputational and academic injury; loss of professional,

research, academic, and/or advancement opportunities; and other damages.

83.     Defendants' conduct constitutes unlawful discrimination that violates Section 1557

of the Affordable Care Act and its implementing regulations.

84.     Plaintiff Perera is therefore entitled to an order and judgment, and injunctive and

declaratory relief, that holds the actions of Defendants are unlawful, rescinds or leaves without effect

the termination of their grants, reinstates grant eligibility, and ensures that Plaintiff's future or pending

grant applications are not subjected to similar unlawful discrimination.

[*remainder of page left intentionally blank*]

17

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

1.      Enter judgment declaring as unlawful or unconstitutional (i) the Agency Directives and any other agency guidance prohibiting federal research funding, and (ii) the Challenged Agency Actions, because the research relates to the Banned Topics;

2.      Issue preliminary and permanent injunctive relief enjoining Defendants, including their employees, agents, and successors and those in active concert or participation with them, from either: (i) implementing, enforcing, or effectuating the Agency Directives or any agency guidance setting forth "agency priorities" prohibiting federal funding, or (ii) taking any of the Challenged Agency Actions, because the research relates to the Banned Topics;

3.      Order that the terminations of Plaintiffs' affected NIH-funded grants be deemed without effect and vacated, and that Defendants immediately reinstate Plaintiffs' affected NIH-funded grants and restore full access to all funds unlawfully withheld;

4.      Order Defendants to expunge any and all adverse findings or designations in agency records related to application of the Agency Directives to Plaintiffs' affected NIH-funded grants;

5.      Enjoin Defendants, and those in concert or participation with them, from imposing any negative consequences on Plaintiffs for involvement in this litigation;

6.      Waive the requirement for the posting of a bond;

7.      Award Plaintiffs their reasonable attorneys' fees and costs; and

8.      Grant any other or further relief the Court may deem just and proper.

Respectfully Submitted,

Drs. Minoli Perera & Melissa Simon

By their attorney,

*/s/ Bernard Schott*
Bernard (Ben) Schott (Bar No. 32323)
SCHOTT LLC
1351 N. Rolfe St., Apt. 1012
Arlington, VA 22209
(t) 773.350.6470
ben@bkschottlaw.com